**Affirmed in Part, Reversed in Part, and Remanded, and Majority and Dissenting Opinions filed August 20, 2020.**



**In the**

# Fourteenth Court of Appeals

### NO. 14-20-00169-CV

## IN THE INTEREST OF M.P., A CHILD

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 18-CP-0111**

## MAJORITY OPINION

The issues in this case involve whether the trial court's findings to terminate a father's parental rights are supported by legally- and factually-sufficient evidence. This accelerated appeal arises from a final order in which, after a final hearing tried to the bench,[1] the trial court terminated the parental rights of appellant J.P. (Father) with respect to his daughter M.P. (Maria),[2] who was one-year old at

---

[1] We refer to the final hearing as the "trial."

[2] To protect the minor's identity, we have not used the actual names of the child, parents, or other family members. *See* Tex. R. App. P. 9.8.

time of trial, and appointed appellee the Department of Family and Protective Services (the Department) to be Maria's permanent managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1); Tex. R. App. P. 28.4 (accelerated appeals in parental-termination cases).[3]

In his first issue, Father challenges the legal and factual sufficiency[4] of the evidence to support the trial court's findings in its final order (1) on the predicate grounds of endangerment, failure to comply with the court-ordered family-service plan, and use of a controlled substance in a manner that endangered the health or safety of Maria, and (2) that termination is in the best interest of Maria. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P), (b)(2). In his second issue, Father challenges the trial court's appointment of the Department as permanent managing conservator of Maria. *See* Tex. Fam. Code Ann. § 153.131.

We determine the evidence is legally and factually sufficient to support the trial court's findings that the Department proved by clear and convincing evidence that (1) Father failed to comply with the court ordered family-service plan under the predicate ground of subsection O and (2) termination of Father's parental rights was in Maria's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (b)(2). As only one predicate finding under section 161.001(b)(1) is necessary to support a final order of termination when there also is a finding that termination is in the child's best interest, we affirm the trial court's termination of Father's parental rights regarding Maria. *See* Tex. Fam. Code Ann. § 161.001(b)(1). However, under the Texas Supreme Court's decision in *In re N.G.*, we must also address Father's

---

[3] Maria's mother K.S. (Mother) signed an affidavit voluntarily relinquishing her parental rights regarding Maria. *See* Tex. Fam. Code Ann. § 161.103. The trial court terminated Mother's parental rights on that basis, and Mother does not appeal.

[4] While Father did not file a motion for new trial, "[i]n a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief." Tex. R. App. P. 33.1(d).

legal- and factual-sufficiency challenges to predicate grounds D and E, as due process requires this inquiry due to the collateral consequences of an affirmative finding under those grounds. *See* 577 S.W.3d 230, 237 (Tex. 2019). Applying this court's decision in *In re L.C.L.*, we conclude that the evidence is legally sufficient, but factually insufficient to support the trial court's affirmative findings on predicate grounds D and E. *See* 599 S.W.3d 79, 84–86 (Tex. App.—Houston [14th Dist.] 2020, no pet. h.) (en banc). Accordingly, we sustain Father's factual-sufficiency challenges to the trial court's affirmative findings under predicate grounds D and E, reverse the final order as to those findings, and remand the case for a new trial limited to those grounds.

## I. BACKGROUND

### A. Pretrial proceedings

#### 1. Pretrial removal affidavit

According to the pretrial removal affidavit, which was admitted into evidence at trial, the Department received a report alleging neglectful supervision of Maria, including allegations that the home where Father and Mother lived with Maria smelled and "was known to be covered in animal feces" and that Father was "on drugs." The following day, the Department received three additional referrals. The first alleged that Maria, then three weeks old, had a swollen neck and head, was lethargic and unresponsive, was mottled in color, and had a large hematoma on the right side of her head. The second and third referrals suggested that swelling on the top of Maria's head was due to non-accidental trauma, and reported that Father and Mother "might both have a learning disability" and "lacked basic parenting skills needed to ensure the child's health and well-being."

Child Protective Services (CPS) investigator (and affiant) C. Archibald

visited the family home. She noted in her removal affidavit that she "suspected that mother and father might have some intellectual delay." Father related that he had attended "special classes" in school and received Supplemental Security Income (SSI) "due to a learning disability." Archibald noted concerns about pillows and blankets in the play yard with Maria. She did not, however, express any other concerns with the home environment. Father and Mother each took an oral-swab test, and each showed negative results for all tested substances.

The day after Archibald's visit, four-week old Maria was admitted to Texas Children's Hospital with bleeding in her brain. Hospital staff did not know the cause of the injury, though they noted that Maria did not have a skull fracture and stated that her injury may have been caused by seizures. Maria's urinalysis on the day of her admission was positive for cocaine. Hospital staff stated that Mother and Father appeared "very concerned" about the positive test, and both denied drug use. Eleven days after Maria's admission, hospital staff informed Archibald that Maria had also tested positive for methamphetamine.

Other CPS investigators interviewed Mother and Father at the hospital on the day of Maria's admission. Mother told investigators that Maria was born with a soft spot on her head, neither she nor anyone else had hurt Maria, and neither she nor anyone else in the home used drugs. Father stated during his interview that he was unsure as to what had happened to Maria, but that 9-1-1 had been called after a neighbor panicked about Maria's condition. He said that no one in the home used drugs, but stated he would not take a drug test "because he does not lie and does not use drugs."

A CPS staff member transported Father and Mother for drug screens. During the transport, Mother admitted to using methamphetamine before Maria was born, and Father admitted to using methamphetamine and marijuana. Mother took both a

urine-drug screen and a hair-follicle test, while Father took only a urine-drug screen. The urinalysis results for Father and Mother were negative for any tested substance.

Archibald spoke with Father's aunt M.A. (Aunt) concerning a potential placement for Maria. Aunt initially agreed to care for Maria, but then expressed reservations, saying Father had asked her to agree to the placement but secretly allow Maria to remain in his care. After additional consideration, Aunt refused the placement.

Archibald then spoke to Father and Mother to solicit recommendations for a placement for Maria. During the conversation, Father again stated he did not use drugs and said he did not understand why Maria could not go home with him. Later in the conversation, Archibald informed Mother that her hair-follicle test had returned positive for methamphetamine and amphetamine. When Archibald asked Father why he had not taken a hair-follicle test, Father admitted he would have tested positive for marijuana and methamphetamine.

Based on the Department's petition supported by Archibald's affidavit, the trial court removed Maria to the Department's care.

### 2. Family-service plan

The Department prepared a family-service plan for Father. The plan required Father to complete a list of tasks and services, including:

- maintaining monthly contact with his CPS caseworker;
- notifying his CPS caseworker C. Franklin within five days of any change of address or telephone number;
- participating in services designed to alleviate the risks leading to Maria's removal from his care;
- scheduling and completing a drug-and-alcohol assessment and

following recommendations for treatment;

- submitting to random drug testing;
- scheduling and completing a psychological evaluation;
- scheduling and participate in individual counseling;
- completing parenting classes;
- maintaining gainful employment and providing employment information to his CPS caseworker;
- maintain safe and stable housing and provide proof of housing to his CPS caseworker; and
- attend visitations with Maria as scheduled in the Department's visitation plan.

In a status-hearing order signed September 6, 2018, the trial court found that Father "**has** reviewed and understands the service plan." There is no explanation as to how the trial court reached this conclusion; the order indicates that Father did not attend the hearing.

On January 10, 2019, the trial court signed an initial permanency hearing order that included the finding that Father "~~has/has not~~ *has not* demonstrated adequate and appropriate compliance with the service plan~~.~~*, due to an intellectual disability. [Father] shall comply with ¶ 6.2 of this order for all services as needed.*"[5] Paragraph 6.2 of the order states, "*It is ORDERED that [G.W.],*[6] *or anyone [Father] designates, may accompany [Father] to any and all services (e.g., evaluations, classes, outpatient, etc.) that may require any sort of reading.*"

In an order signed August 8, 2019, the trial court found that Father "has not demonstrated adequate and appropriate compliance with the service plan," without

---

[5] The italicized portions of the order as quoted herein reflect handwritten notations on the order.

[6] According to Father's brief, G.W. is Father's mother.

qualification.[7]

## B.    Trial

Father did not appear at trial. Aunt testified that Father told her that his lawyer had advised him not to attend because of an outstanding warrant for his arrest. A criminal complaint against Father for resisting arrest by using force against a peace officer was admitted into evidence, along with a capias citing Father's failure to appear filed in April 2019.

### 1.    Investigator Archibald

Archibald testified that she conducted an investigatory visit after receiving multiple referrals. She was concerned that there were items in Maria's play yard that were not appropriate for a child her age and observed that Father did not hold Maria properly when attempting to feed her. Archibald noted that Father had an "intellectual disability" and received SSI payments, and Father told her that he had been in special education classes throughout his schooling.

Archibald testified that Maria had been taken to the hospital for emergency medical attention after Father called 9-1-1. After being admitted, Maria tested positive for cocaine and methamphetamine at one-month old. When Archibald discussed Maria's positive test with Father and Mother, they denied using illegal drugs.

Before her initial meeting with the family, Archibald received allegations of drug use by Father. During her initial meeting, Archibald gave Father and Mother instant oral swabs, which were negative for tested substances. Father also tested negative for illegal drugs on a later urinalysis but refused to take a hair-follicle test. Father, however, admitted to Archibald that he had used methamphetamine and

---

[7] Each of these orders was admitted into evidence.

marijuana. Mother also admitted to using illegal drugs and tested positive for methamphetamine and amphetamine.

### 2. CPS Caseworker

CPS conservatorship worker A. Stewart testified that she took over the case at the end of July 2019. Before Stewart's assignment to the case, N. Foster had been assigned. Foster, in turn, took over the case from D. Simmons in approximately April 2019.[8]

Stewart testified that, at time of trial, Father had failed to complete a drug and alcohol assessment required by the family-service plan. Father also missed two consecutive appointments for a psychological evaluation mandated by the service plan, failed to participate in individual therapy as requested, "and other than that, he completed no other service or made an attempt to schedule any other services," according to the Department's records. Stewart admitted, however, that the case had been reassigned from Simmons because Simmons was "not doing what she was supposed to do as far as visiting children, documentation." She admitted it was "very possible" that there were "things said and done by the parents or the caseworker that are not documented because [Simmons] had a problem with documentation."

Regarding family visits, Stewart testified there was one visit with Father and Maria recorded on May 7, 2019, though she stated she would not be surprised if there were additional family visits that were not documented. Father had not contacted her to set up any visits with Maria during her assignment to the case, and there were no records indicating that Father had contacted other caseworkers to do so. The one documented visit "was described as a really good visit and both

---

[8] Yet another caseworker, C. Franklin, was listed as Father's contact on the family-service plan filed in August 2018.

parents engaged with the child."

Stewart stated that she was aware that Father had a disability, although she was not aware of the specifics. She was informed that Father cannot read at all, although she did not learn this until three months after she was assigned the case; to that point, she thought "he could read some" and "just needed help reading." Stewart testified that a Bryan caseworker assigned to Father was aware Father could not read and had "some idea" of Father's intellectual disability.[9] She noted that Father was allowed to bring anyone he liked to any services that required reading, though she was unaware this was by court order. However, she also testified that when she was contacted by Father's grandfather (Grandfather), "who wanted to assist [Father]," she was instructed by her supervisor to inform Grandfather that she could not tell him anything about the case, and did so. Stewart also testified that, after her call with Grandfather, she sent Father a text message explaining why she could not give information to Grandfather. In response, Father called her back, and she explained the situation to him over the phone.

Regarding other contacts with Father, Stewart testified that she attempted to call him on the phone on August 6, September 17, and October 7, 2019, but Father did not answer or return her calls. Stewart also testified that the Bryan caseworker instructed Father to go for drug testing on August 1 and September 16, 2019, but that Father did not get tested. The caseworker also tried to contact Father on October 7 and November 6, 2019, but received no answer. Stewart did not know if the caseworker attempted to contact Father by phone or text but believed she made one in-person contact with Father. According to Stewart, there was no contact

---

[9] Stewart testified that, according to case notes, Father and Mother moved from Galveston County, where this case originated, to Bryan in July 2019, informing their caseworker after the fact that they had moved.

between Father and the Department after November 6, 2019, up to and including trial on January 14, 2020.

Regarding placement, Stewart testified that Aunt and her husband (Uncle) initially said they would take Maria, then declined, and Maria was placed in unrelated foster care. Since December 31, 2019, Maria had been placed with Aunt and Uncle. She stated that a home study had been conducted and approved for Aunt and Uncle and that they would like to adopt Maria.

### 3.    Placement

Aunt testified that Maria had been placed with her and since December 31, 2019, two weeks before trial. She said Maria was doing "great." Maria was walking, running, and saying nine or ten words. Maria referred to Aunt and Uncle as "Mama" and "Dada" and referred to their son as "Brother." She was sleeping and eating well and had a "great" nighttime routine. She did not have any medical needs requiring immediate treatment. Maria attended the same daycare as Aunt's son, and Aunt's plan was for Maria to eventually go to the same school as her son. Aunt and Uncle were both employed and had money left over each month after paying their expenses. Aunt stated that she and Uncle would "love" to adopt Maria and planned to do so.

Aunt testified that, before Maria's removal, the home where Father and Mother lived with Maria was "unlivable," as Father and Mother did not do dishes or laundry. She also stated that Father and Mother did not feed Maria in a timely fashion. Despite these conditions, Aunt did not consider Maria to be in any danger at the time.

Aunt testified that, at some point after Maria's removal, Father was "on meth" and entered a 30-day rehabilitation program, but left after one day because

he did not want to be there anymore. She testified that Father appeared unconcerned about completing his services and expressed a desire to relinquish his rights to Maria. She testified that Father told her, "We know that she would be better with you guys. We want her—we want you to have—to have her to take care of her."

Aunt estimated Father had the intelligence of a 15- or 16-year old, and noted he was able to finish high school. She said she had seen him reading on his phone and that he had never told her she could not read. She also testified that she had never received anything in writing from Father, and that, according to her brother-in-law, Father said that he does not understand a lot of what he reads. Regarding Father's service plan, Aunt testified that Father was "refusing to take certain drug tests at certain times" and "refusing to do his plans that he needs to do," and that he appeared unconcerned about complying with the plan.

### 4. CASA

Court Appointed Special Advocate (CASA) supervisor R. Rodriquez testified that Maria was doing "really well" with Aunt and Uncle, and compared to her previous placements, she was thriving and seemed like a "completely different child." Rodriquez further testified that three family visits occurred, on November 28, 2018, May 7, 2019, and May 23, 2019. According to CASA reports, Father was affectionate towards Maria and appeared to be a loving, caring father. During one visit, he reminded Mother to hold Maria correctly, as he had been taught by the Department.

## II. ANALYSIS

In Father's first issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate grounds of

endangerment under subsections D and E, failure to comply with the court ordered family-service plan under subsection O, and use of a controlled substance in a manner that endangered the health or safety of Maria under subsection P, and also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in Maria's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P), (b)(2). In Father's second issue, he challenges the trial court's appointment of the Department as Maria's permanent managing conservator. *See* Tex. Fam. Code Ann. § 153.131.

## A. Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *See In re J.F.C.*, 96 S.W.3d at 266. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* However, this does not compel us to disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear and convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (internal quotation marks omitted). We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## B. Predicate termination grounds

The trial court made predicate termination findings that Father had committed acts establishing the grounds set out in subsections D, E, O, and P of section 161.001(b)(1), which provides for termination of parental rights if the factfinder finds by clear and convincing evidence that the parent has:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child; [or]

(P) used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:

> (i) failed to complete a court-ordered substance abuse treatment program; or

> (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### 1. Failure to comply with court order under subsection O

We first address Father's challenge to the trial court's finding by clear and convincing evidence that he:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of

14

the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(O). Father does not dispute that: (1) his family-service plan was a "court order" for purposes of subsection O; (2) Maria was in the temporary managing conservatorship of the Department for not less than nine months; and (3) Maria was removed under Family Code chapter 262 for abuse or neglect. *See id.* In addition, Father does not contend that he complied with the service plan. Indeed, we note that there is substantial evidence that he did not, as he failed to complete, at minimum, drug and psychological evaluations and random drug testing. While there is some doubt whether Father completed services while Simmons was the caseworker, Stewart, who was assigned the case from July 31, 2019 until trial in January 2020, testified that Father had not completed any services at all during that time period or maintained any contact with the Department for at least the last two months of the case. *Cf. In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The Family Code does not provide for substantial compliance with a family services plan.").

Instead, Father argues that the service plan was not sufficiently "specific" under subsection O because, as a general matter, it did not contain deadlines for completion of tasks. This argument has been rejected by at least one of our sister courts on the ground that, even when the deadline for completion of a task is not specifically delineated, a parent could reasonably infer from the proceedings that, at the very least, "the deadline for compliance for each requirement would have been prior to termination." *In re O.R.F.*, 417 S.W.3d 24, 43 (Tex. App.—Texarkana 2013, pet. denied) (concluding arguments that service plan was

15

insufficiently specific due to lack of deadlines was "wholly without merit"). Moreover, Father's plan included some tasks for which deadlines were either stated or inapplicable. For example, the plan instructed Father to contact his caseworker monthly, yet the evidence showed that the Department had not had any contact with him at least since November 7, 2019, more than two months before trial. Likewise, the service plan required Father to submit to "random" drug testing. *See id.* (explaining there could be "no date certain" for random drug testing). Stewart testified that the Bryan caseworker instructed Father to attend drug testing at least twice, but he did not go. We reject Father's argument that the evidence was legally and factually insufficient to support the trial court's subsection O finding due to a lack of deadlines in the service plan.[10]

Father next argues the subsection O finding should be reversed because he proved his affirmative defense that he was unable to complete the plan:

> (d) A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> > (1) the parent was unable to comply with specific provisions of the court order; and
> >
> > (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to

---

[10] Throughout his treatment of subsection O, Father also argues that the service plan was not presented to him in a language he could understand, or made otherwise available, as required by Family Code section 263.102. *See* Tex. Fam. Code Ann. § 263.102. We construe this as an argument supporting his subsection (d) defense, and not as a separate due-process challenge, as Father has not argued in the trial court or in this court that the Department violated his due-process rights by failing to comply with section 263.102. *See* Tex. R. App. P. 33.1(a). Likewise, while Father argues in his brief that the Department failed to comply with the Americans with Disabilities Act by failing to accommodate his "intellectual disabilities" in conjunction with his service plan, he clarifies in his reply that this argument is for illustrative purposes only, and that he does not seek relief under the ADA. *See generally* 42 U.S.C. §§ 12101–12213 (2018).

any fault of the parent.

Tex. Fam. Code Ann. § 161.001(d). The trial court found that Father failed to prove this defense by a preponderance of the evidence.

Regarding the first prong of his subsection (d) defense, Father argues that he was unable to understand the service plan, and accordingly was unable to comply with it, because he cannot read due to his intellectual disabilities.[11] While the statute requires the parent to prove that he could not comply with "specific provisions" of the court order in question, evidence that a parent cannot read at all may support a blanket determination that the parent was unable to comply with any part of the court order due to a lack of comprehension. *See id.*

Here, however, the evidence is not so clear-cut. Father did not attend trial, leaving us to depend on the testimony of others—and sometimes the second- or third-hand testimony of others. Stewart testified that she first thought that Father could read to some extent before later learning that Father could not read "at all." This, combined with the trial court's pre-trial finding, entered into evidence, that Father could not comply with the service plan due to "intellectual disabilities" and was to be provided an accommodation for services that that "require any sort of reading," constitutes significant evidence that Father's inability to read prevented him from complying with the service plan.

By failing to identify specific portions of the service plan he was unable to comply with, however, Father assumes the burden to prove that he could not comply with the service plan *at all* because of his lack of comprehension of it. *See In re N.W.L.T.*, No. 14-18-00497-CV, 2018 WL 6217313, at *8 (Tex. App.— Houston [14th Dist.] Nov. 29, 2018, pet. denied) (mem. op.) (parent must prove

_____

[11] While Father asserts that he cannot read due to his intellectual disabilities, the record does not contain evidence clarifying the precise nature of his disabilities.

17

subsection (d) defense as to all possible grounds supporting trial court's judgment). We note some evidence in the record conflicting with such a conclusion, including Aunt's testimony that she had seen Father "maybe reading things on his phone" as well as the trial court's pre-trial finding that Father "**has** reviewed and understands the service plan." Moreover, Father does not explain how his inability to read prevented him from completing tasks such as maintaining contact with the Department (the evidence shows he contacted Stewart by phone at least once, so he was aware of how to do so), attending family visits (which he did at least once), or submitting to random drug screening, particularly in light of Aunt's testimony that Father was "refusing to take certain drug tests at certain times" and "refusing to do his plans that he needs to do." *See id.*

In addition, to prove his defense Father must also show that he made a good-faith effort to comply with the service plan. Tex. Fam. Code Ann. § 161.001(d). Father's only evidence that he attempted to comply with the service plan is Stewart's testimony that Father's grandfather called Stewart in an attempt to "assist" Father. The evidence is not clear, however, that Grandfather did so at Father's behest, so even this testimony does not necessarily reflect Father's good-faith efforts to comply. In addition, there is evidence that Father took action inconsistent with making any effort to comply with the service plan, including repeatedly failing to return calls from his caseworkers for the final six months of the case. When Aunt was asked whether Father wanted to work the services required by the family-service plan, she testified that Father "never really seemed to worry about the plan about what he was supposed to do," in addition to her testimony that Father was "refusing" to take drug tests or otherwise attempting to complete required services. This evidence supports a finding that Father did not make a good-faith effort to comply with the service plan as required by subsection

18

(b). *See id.*

Our review of the record indicates that the Department succeeded in proving by clear and convincing evidence that Father failed to comply with the court-ordered service plan under subsection O and that Father failed to prove his subsection (d) affirmative defense by a preponderance of the evidence. We accordingly overrule Father's challenge to the trial court's subsection O finding.

Having determined that one predicate ground for termination supports the trial court's termination order, we need not address Father's arguments concerning predicate ground P. *See In re A.V.*, 113 S.W.3d at 362. Due process requires, however, that when a parent has raised the issue of insufficiency of the evidence to support the jury's findings under Family Code section 161.001(b)(1)(D) or (E), an appellate court must address those endangerment findings to ensure a meaningful appeal due to the collateral consequences of a finding under those subsections. *In re N.G.*, 577 S.W.3d at 237. Due-process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under Family Code section 161.001(b)(1)(D) or (E). *Id.* Accordingly, we proceed to the trial court's endangerment findings under section 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1).

### 2. Endangerment under subsection D

"To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Endangerment under subsection D is established by evidence related to the child's "conditions or surroundings." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Analysis of the child's conditions or surroundings may include evidence of the acceptability of living conditions, parental conduct in the home,

and other issues concerning the child's environment. *See In re S.R.*, 452 S.W.3d at 360. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See id.* Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *See id.* In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *Id.*

The Department first addresses parental drug use as grounds for endangerment. The evidence of drug use before removal shows that the Department received a referral stating that Father was "on drugs." Father tested negative for tested substances on an oral swab given by investigator Archibald during her initial home visit. Father also tested negative on a urine-drug screen he took after Maria was admitted to the hospital but before the Department removed Maria. However, Father refused a hair-follicle test at that time, admitting to the CPS worker who drove him to the test and to Archibald that, had he taken the test, he would have tested positive for methamphetamine and marijuana. The evidence also shows that Mother, who lived with Father and Maria, admitted to using methamphetamine before Maria's birth and tested positive for methamphetamine and amphetamine on a hair-follicle test. Finally, Maria herself tested positive for cocaine and methamphetamine at the hospital.

Our court recently clarified that a showing that a parent used illegal drugs is not, on its own, sufficient evidence of endangerment, and that there must be a showing of a causal connection between the parent's drug use and endangerment of the child. *In re L.C.L.*, 599 S.W.3d at 84–86. While Father admitted that he used methamphetamine, which Maria later tested positive for, as well as marijuana,

20

there is no evidence as to when, how often, or where Father used these substances. It is entirely possible that Father used these substances outside of the home (or otherwise away from Maria), or before Maria's birth, under which circumstances it is difficult to determine how Father's drug use caused an endangering environment for Maria. *See id.*

The Department also points to evidence that Mother used drugs, testing positive for methamphetamine and admitting to using the drug before Maria was born. However, there is no evidence in the record showing that Father knew that Mother used methamphetamine or any other drug until after Maria was already in the hospital, and accordingly this evidence does not support a finding of endangerment under subsection D. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (requiring that parent "knowingly" allowed child to remain in endangering conditions).

We turn to the Department's other arguments concerning endangerment under subsection D. The Department points to evidence that Aunt described the home whether Father and Mother lived with Maria as "unlivable," testifying that Father and Mother did not wash dishes, do laundry, or feed Maria in a timely manner. Aunt, however, also testified that, despite her description of these conditions, she "didn't know that [Maria] was in any danger or anything like that." Moreover, Archibald did not note any such concerns during her investigatory visit to the family home, despite detailing that she was concerned about the presence of pillows and blankets in Maria's play yard.

Aunt also testified that she was concerned that Father and Mother lacked adequate parenting skills, though she also testified she "thought that was normal because they were new parents." Archibald noted in her affidavit that Father did

not hold Maria properly.[12]

Reviewing this evidence in the light most favorable to the trial court's ruling, there is legally-sufficient evidence to support the finding of endangerment under subsection (D), and accordingly we overrule Father's issue in that regard. Viewed in a neutral light, however, the evidence is factually insufficient. With regard to Father's drug use, while there is evidence that Father used methamphetamine and that Maria tested positive for methamphetamine, there is no evidence linking Father's drug use to Maria's positive test or otherwise suggesting that Father's drug use created endangering conditions or surroundings for Maria, particularly as there is no evidence in the record concerning where or in what manner Father used illegal drugs. *See In re L.C.L.*, 599 S.W.3d at 84–86. Likewise, there is no evidence that Father was aware of Mother's methamphetamine use before Maria's birth. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Indeed, the evidence that Mother used drugs not only fails to support the inference that Father knowingly allowed Maria to remain in endangering conditions, it also provides an alternate basis for inferring how illegal drugs entered Maria's system. *Cf. City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005) ("[W]hen the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well."). The evidence concerning Maria's living environment and Father's parenting skills is conflicting and scant, and likewise fails to provide a factually-sufficient basis to conclude by clear and convincing evidence that Father knowingly placed or knowingly allowed Maria to remain in conditions or surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann.

---

[12] The Department also notes in its argument on endangerment that Maria was admitted to the hospital with bleeding in her brain, but concedes that there is no evidence that Father caused Maria's injury.

22

§ 161.001(b)(1)(D). We sustain Father's challenge to the factual sufficiency of the evidence supporting the trial court's finding of endangerment under subsection D.

### 3.      Endangerment under subsection E

A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct. *Id.* at 360–61. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.*

In addition to pre-removal evidence discussed regarding subsection D, we consider the following post-removal evidence. There is some evidence that Father used illegal drugs after Maria was removed. Aunt testified that Father was "on meth" and that he attended a rehabilitation facility for drug use, but that he left the facility after one day. However, Aunt did not testify regarding the frequency or severity of Father's drug use or the details of his rehabilitation program.

The Department also points to evidence that Father failed to complete his court-ordered service plan and failed to visit Maria for more than seven months before trial. Regarding the service plan, Stewart testified that Father had failed to

23

complete drug-and-alcohol assessment, a psychological evaluation, or individual therapy, failed to submit to drug testing as directed, and "completed no other service or made an attempt to schedule any other services." Stewart also testified, however, that Simmons, the caseworker until approximately April 2019, was "not doing what she was supposed to do as far as visiting children, documentation," such that it was "very possible" that there were "things said and done by the parents or the caseworker that are not documented because [Simmons] had a problem with documentation."

Moreover, as discussed above, there was evidence in the record that Father cannot read, including Stewart's testimony of her understanding that Father cannot read "at all," Aunt's testimony of her understanding that Father "does not understand a lot of what he reads," and the trial court's pre-trial finding that Father was unable to complete the service plan due to "intellectual disabilities" and was to be allowed to bring a second person with him to any service that required "any sort of reading." The substantial evidence that Father was unable to read, and that this affected his ability to comply with the service plan at least to some extent, undermines the Department's argument that Father endangered Maria by failing to comply with the plan.

Likewise, regarding family visits, Stewart testified that the last recorded visit was in May 2019, and there had been no visits since she took over the case on July 31, 2019, but also testified she would not be surprised if there were additional family visits that were not documented. Indeed, CASA supervisor Rodriquez testified that CASA records showed three family visits, one in November 2018, and two in May 2019. Nonetheless, the evidence shows that Father did not visit Maria, or request a visit with Maria, from the time that Stewart took over the case on July 31, 2019 though the trial on December 14, 2020, although the Department

cannot say for sure how many visits occurred before that time.

Regarding parenting skills, Stewart testified that the one post-removal family visit in the Department's records was "really good," that Father "engaged" with Maria. Rodriquez testified that the CASA report showed reflected that Father was "affectionate" and "caring" when visiting Maria, and that he showed Mother how to properly hold Maria based on the instructions he had received.

The Department also points to evidence that Father did not attend trial due to a warrant for his arrest as evidence of Father's endangering conduct. While criminal violations and incarceration are not enough to show endangerment by themselves, they can be evidence of endangerment if shown to be part of a course of conduct that is endangering to the child. *See Boyd*, 727 S.W.2d at 533–34. Here, however, the record does not reflect that Father was ever convicted or incarcerated for this alleged transgression, nor does it show any other criminal history for Father.

Viewed in the light most favorable to the trial court's finding, we conclude there is legally-sufficient evidence that Father endangered Maria under subsection E and overrule Father's issue in that regard. Viewing the evidence in a neutral light, however, we again reach a different conclusion. Considering both pre- and post-removal evidence, the record shows that Father used methamphetamine both before and after Maria's removal. However, as discussed above in subsection D, there is no evidence concerning the when, where, or to what extent Father used illegal drugs, and no evidence of a causal connection between Father's drug use and endangerment to Maria. *See In re L.C.L.*, 599 S.W.3d at 84–86. Regarding service-plan compliance, while there is evidence that Father took little action to complete the plan, there is the looming question of to what extent his difficulty reading prevented his compliance. Further, the evidence shows that the Department

does not know what services Father completed, given caseworker Simmons's issues with documentation. While the evidence shows that Father did not contact Stewart during the last several months of the case, either to request a family visit or otherwise, the record also shows that Father attended at least three family visits during the life of the case and that Father was caring and attentive during those visits. Finally, while there is some evidence that Father did not attend trial due to fear of incarceration, there is no evidence in the record that Father was convicted of any crime.

Based on the gaps and conflicts in this evidence, the trial court could not have reasonably concluded under a clear and convincing standard that Father engaged in conduct or knowingly placed Maria with persons who engaged in conduct that endangered Maria's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). We sustain Father's factual-sufficiency challenge to the trial court's finding of endangerment under subsection E.

As we have determined that at least one predicate ground for termination is supported by legally- and factually-sufficient evidence, we proceed to Father's challenge to the trial court's finding that termination of his parental rights was in Maria's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1).

## C.    Best interest of the child

### 1.    Legal standard

Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in the best interest of Maria. *See* Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing

26

Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d at 533. However, prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See id.* The considerations that the factfinder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the

relationship the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

## 2. Sufficiency of the evidence

We begin by addressing collectively the desires of the child, her present and future physical and emotional needs, the stability of the home or proposed placement, and the plans for the child by the individuals or agency seeking custody. Regarding the desires of the child, Maria was removed when she was approximately four-weeks old and was one-year old at time of trial. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Here, the evidence reflects that Maria was placed with Aunt and Uncle and was doing well, with no special medical needs. Although Maria was placed with Aunt and Uncle only two weeks before trial, Aunt testified that she was calling Aunt and Uncle "Mama" and "Dada" and their son "Brother," was saying nine or ten words, and was eating and sleeping well. Aunt testified that Maria was attending the same day care as her son and was doing "great" with the transition, and that she planned to send Maria to the same school her son attended for kindergarten. Aunt testified that both she and Uncle worked and that they had additional income left over each month after their expenses were paid. Aunt testified that she and Uncle would "love" to adopt Maria.

CASA supervisor Rodriquez testified that she was concerned about how Maria would handle the transition from foster care to Aunt and Uncle's home, but that Maria was doing "really well." She related that, although Maria had been a "difficult" child in prior placements, the CASA advocate who visited Maria after her placement with Aunt and Uncle stated that Maria was a "completely different

28

child. She's happy. She's thriving, walking, talking more, friendlier, just completely different. It's really interesting and wonderful."

Father did not testify at trial, and there was no evidence as to his plans for Maria, his employment status, or his habitation. Aunt testified that, after Maria's removal, Father indicated to her his desire to surrender his parental rights to Maria so that Aunt and Uncle could take care of her. Rodriquez testified that the CASA advocate assigned to the case had described Father as "affectionate" and a "loving, caring father." While Archibald had concerns that Father did not hold Maria properly during her investigation, Rodriquez testified that Father later learned how to properly hold Maria and was instructing Mother as to how to do so. Although Father participated in at least three family visits, the last recorded visit was in May 2019, when Maria was less than a year old.

We next consider evidence of present and future physical and emotional danger to Maria and acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate. Although we determined above that evidence concerning Father's conduct was factually insufficient to support a finding of endangerment under subsections D or E, we reconsider that evidence for best-interest purposes. *See In re S.R.*, 452 S.W.3d at 366. The evidence shows that Father used methamphetamine both before and after Maria's removal, though there is no evidence of how often or how much. Father also lied about his drug use on multiple occasions and asked Aunt to take custody of Maria only to return her to Father's care. There is also evidence that Father did not complete the court-ordered services assigned to him.

Father argues, under the factor concerning any excuse for the parent's acts or omissions, that he could not complete his service plan because he cannot read. We agree that the evidence that Father cannot read weighs against a conclusion that not

completing his service plan should be held against him in the best-interest analysis. The vast majority of the remaining evidence, however, supports the trial court's finding that termination of Father's parental rights is in Maria's best interest, including the evidence of the stability of Maria's placement, Maria's progress in that placement, Aunt and Uncle's intention to adopt Maria, and the comparative dearth of evidence regarding Father's resources and plans for taking care of Maria. *See In re L.M.*, 572 S.W.3d 823, 838 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[T]he trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the child's best interest so that she could promptly achieve permanency through adoption."). Moreover, Father's lack of reading ability does not excuse his continued drug use or his not taking basic steps, such as returning calls to his caseworker and making a good-faith effort to complete assigned services, consistent with returning Maria to his care. *See id.* at 837–38 (holding that court "may consider whether a parent demonstrated willingness to effect positive environmental and personal changes within a reasonable amount of time.").

Our review of the *Holley* factors indicates that the trial court's finding by clear and convincing evidence that termination of Father's parental rights is in Maria's best interest is supported by legally- and factually-sufficient evidence, and accordingly we overrule Father's issue in this regard. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72.

We sustain Father's first issue with regard to his challenge to the factual sufficiency of the trial court's findings concerning predicate grounds D and E. We overrule the remaining challenges in Father's first issue.

30

**D.      Conservatorship**

In his second issue, Father challenges the trial court's appointment of the Department as Maria's permanent managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). The trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Having concluded the evidence is sufficient to support the termination of Father's parental rights, we conclude the trial court had sufficient information on which to exercise its discretion, and did not abuse its discretion in appointing the Department as sole managing conservator of Maria. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding in which evidence was sufficient to support termination of parental rights). We overrule Father's second issue.

31

## III. RESPONSE TO DISSENT

The dissent begins with a strawman parade-of-horribles argument that the court is trying to enable bad parenting. This form of argument is often used to deflect attention from the work of deciding cases with troubling facts.

On the merits, the dissent acknowledges that *N.G.* instructs appellate courts to "review the legal *and* factual sufficiency of the evidence" of D and E predicate termination grounds to satisfy due process. *See In re N.G.*, 577 S.W.3d at 239 (emphasis added). Nonetheless, the dissent suggests that a factual-sufficiency review is unnecessary in this case.

This court and others, however, routinely review the legal and factual sufficiency of the evidence in parental-termination cases of (1) predicate termination grounds and (2) best interest, and, when the law and the facts require, reverse on factual-sufficiency grounds even when there is legally-sufficient evidence. *See, e.g.*, *In re A.J.A.R.*, No. 14-20-00084-CV, 2020 WL 4260343, at *7–9 (Tex. App.—Houston [14th Dist.] July 24, 2020, no pet. h.) (mem. op.) (Wise, J., majority) (reversing best-interest finding on factual, but not legal, sufficiency and remanding case for further proceedings). The dissent states that *A.J.A.R.* is distinguishable because, in that case, the court reversed the trial court's final order of termination instead of affirming as we do here, but does not explain why the ultimate result of an appeal should dictate the standard of review applied by this court.

Instead, the dissent appeals to the Supreme Court of Texas to follow the Court of Criminal Appeals and further nullify the factual-conclusivity clause in Texas Constitution article V, section 6. While there is no question that such a nullification would make our work easier, that is not a legitimate legal rationale for

limiting our review.

The dissent also disagrees with our remand for a new trial because "[t]he result of such a new trial will have no impact on Father's parental rights to [Maria]." That is an unquestionably true statement. It is also irrelevant.

The essential holding of *N.G.* is that affirmative findings on predicate grounds D and E must be reviewed on appeal not only because they may affect the current appeal, but also because the Family Code allows findings on D and E grounds to be used in any *future* termination of parental rights for a different child. *In re N.G.*, 577 S.W.3d at 237; *see* Tex. Fam. Code Ann. § 161.001(b)(1)(M). While following the holding of *N.G.* does not affect Father's parental rights to Maria, it does protect Father's due-process rights.

## IV.   CONCLUSION

We conclude that the evidence is factually insufficient to support the trial court's findings, by clear and convincing evidence, that Father:

> 7.2.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(D), Texas Family Code; [and]
>
> 7.2.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code[.]

The remedy for a successful factual-sufficiency challenge is a new trial. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986). Accordingly, we reverse the portion of the trial court's final order in paragraphs 7.2.1 and 7.2.2 and remand the case to the trial court for the limited purpose of a new final hearing on predicate grounds D and E. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We

affirm the remainder of the trial court's final order as challenged on appeal, and in so doing affirm the termination of Father's parental rights regarding Maria.


/s/ Charles A. Spain
Justice

Panel consists of Justices Wise, Bourliot, and Spain (Wise, J., dissenting).